UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LAMAR JOHNSON,

        Plaintiff,

   v.

CITY OF ATLANTIC CITY, N.J.,
SERGEANT RUARK, OFFICER JAMES
SARKOS, OFFICER MICHAEL TRACY,
and DETECTIVE ROSE,

        Defendants.

Civil No. 10-4386(NLH-JS)


**OPINION**


**APPEARANCES:**
LAMAR JOHNSON
BAYSIDE STATE PRISON
4293 ROUTE 47 F1
LEESBURG, NEW JERSEY 08327
       *Pro Se Plaintiff*,

TRACY RILEY
LAW OFFICES OF RILEY & RILEY
100 HIGH STREET, SUITE 302
MOUNT HOLLY, NEW JERSEY 08060
       *On behalf of Defendants*.


**<u>HILLMAN, District Judge</u>**

    Presently before the Court is the Motion for Summary

Judgment of Defendants Sergeant Rodney Ruark, Sergeant James

Sarkos, and Detective Timothy Rose (collectively hereinafter

"Defendants" or "the Officers").[1]  For the reasons that follow,

---

    [1] On August 19, 2011, the Court entered an Order dismissing
Defendants Atlantic City and Officer Michael Tracy. [Docket No.
6.]

the Motion will be granted.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In March of 2008, the Atlantic City Police Department and Atlantic County Prosecutors Office began a joint investigation into ongoing drug operations in southern New Jersey.  (Defs.' Mot. Summ. J., Ex. A, Atl. City Police Dept. Rep. ("ACPD Rep.") at 14.)  During the investigation, law enforcement ascertained that Plaintiff Lamar Johnson was involved in the distribution of cocaine in and around southern New Jersey.  (Id.)  This information was gleaned from several controlled drug buys conducted between confidential informants and Johnson.  (Id., see also Defs.' Mot. Summ. J., Ex. B, Atl. Cnty. Prosecutors Off. Invest. Rep. ("ACPO Inv. Rep.").)  Also during the course of the investigation, law enforcement obtained a wiretap on Johnson's cell phone.  (ACPD Rep. at 14.)  The wiretap was authorized by a judge of the New Jersey Superior Court in Atlantic County.  (Id.)

Law enforcement officials decided to arrest Johnson for possession and distribution of cocaine during a suspected drug deal on October 8, 2008.  (Id.)  On the same day, Sergeant Ruark prepared an arrest warrant, which he swore out before the same Superior Court Judge.  (Id.)  While Sergeant Ruark was swearing out the warrant, Sergeant Sarkos and Detective Rose were monitoring Johnson's activities in his vehicle outside an

2

apartment complex which he frequented in Brigantine, New Jersey. (Id.)

At some point during the surveillance, Johnson entered his vehicle, left the apartment complex, and drove to Atlantic City. (Id. at 14, 16.)  Sergeant Sarkos contacted Sergeant Ruark and informed him that Johnson was on the move, at which time Ruark instructed Sarkos to pull Johnson over and arrest him.  (Id. at 14.)  Sergeant Sarkos and Detective Rose stopped Johnson in a parking lot adjacent to a casino in Atlantic City.  (Id. at 16.) The officers ordered Johnson to exit his vehicle and handcuffed him, and then conducted a search of his person incident to arrest.  (Id.)  Detective Rose observed Johnson immediately bend over to his left side — a maneuver he recognized from his experience and training as an attempt to conceal a weapon or contraband.  (Id.)  Detective Rose ordered Johnson to stand upright, and, upon doing so, observed a prominent bulge protruding from his waistband.  (Id.)  Detective Rose removed the object from Johnson's waistband, and discovered a clear plastic bag filled with multiple white and yellow rock-like pieces, which he recognized as crack cocaine.  (Id. at 14, 16.)  Detective Rose also found $804.00 in the right front pocket of Johnson's pants. (Id. at 16–17.)  Sergeant Sarkos and Detective Rose then placed Johnson in the back of a marked patrol car and transported him to the Atlantic City Police Department.  (Id. at 16.)  The

contraband was marked and sent to the State Police laboratory for further analysis.  (Id. at 14)

Johnson's vehicle was also transported to the Atlantic City Police Department.  (Id. at 15, 20.)  The vehicle was not searched, however, until a search warrant was obtained to do so.  (Id. at 15.)  A search of Johnson's vehicle produced a loaded semi-automatic handgun wrapped in a towel that was hidden on the driver's side of the engine compartment.  (Id. at 18.)  The gun was photographed, documented, and turned over to the Forensic Unit for further testing.  (Id.)

Also following the arrest, police searched the apartment unit in Brigantine where they believed Johnson resided.[2]  (Id. at 20.)  Law enforcement personnel waited outside the apartment, however, until a valid search warrant was obtained to enter.  (Id.)  During questioning of Johnson at the station, it was further ascertained that he also rented a storage unit in Egg Harbor Township.  (Id. at 21.)  Johnson consented to a search of his storage unit, which revealed stashed cash.  (Id.)

On December 18, 2008, Johnson was indicted on a 141-count indictment for his involvement in drug operations between November 7, 2007 and October 8, 2008.  (Defs.' Mot. Summ. J., Ex.

---

[2]  Although in his Complaint Johnson avers that this apartment unit was his home, it was subsequently determined that the apartment actually belonged to his former girlfriend and that he had been temporarily staying with her.  (Id. at 21.)

D, Johnson Indictment.)  On December 22, 2009, Johnson pled guilty before a judge in Atlantic County Superior Court to Count 135 of the Indictment for distributing cocaine in excess of five ounces.  (Defs.' Mot. Summ. J., Ex. E, 12/22/09 Trans. of Plea ("Johnson Plea").)  Johnson was subsequently sentenced to fourteen years imprisonment on March 29, 2010.  (Defs.' Mot. Summ. J., Ex. F, Trans. of Sentence ("Johnson Sentencing").)

On August 19, 2011, Johnson filed a Complaint in federal court, alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983. (Docket Nos. 1, 6.)[3]  On April 3, 2012, Defendants filed the instant Motion for Summary Judgment, seeking judgment in their favor on all of Plaintiff's remaining claims. (Docket No. 27.)  On April 13, 2012, Johnson filed a Response in Opposition by way of a letter communication with the Court. (Docket No. 28.) In this letter, Plaintiff's sole basis of opposition to Defendants' summary judgment motion was stated as follows:

> Plaintiff Lamar Johnson respectfully requests that your Honor rely on it's own, previous determination of November 30, 2011, when ruling on plaintiff's motion for the appointment of pro bono counsel, the court said "The court acknowledges the conclusion of Judge Hillman that plaintiff's complaint demonstrates sufficient merit to withstand immediate dismissal," [] and further "In

---

[3]  Johnson initially filed a complaint before this Court on August 27, 2009, as well as an application to proceed in forma pauperis ("IFP").  The Court, however, denied Plaintiff's IFP application without prejudice.  Plaintiff subsequently reapplied and his case was reopened on August 19, 2011.

granting plaintiff leave to proceed in forma pauperis
Judge Hillman performed a threshold analysis of the
merits of plaintiff's claim against defendant's and found
they were not frivolous."  For the above stated reasons,
plaintiff Johnson request is that the court not grant
defendants motion for summary judgment and that the
meritorious issues involved be afforded the opportunity
for full litigation.[4]

(Pl.'s Resp. Opp'n.) This issue is now ripe for judicial

consideration.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate where the Court is satisfied

that "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.

P. 56(c).

An issue is "genuine" if it is supported by evidence such

that a reasonable jury could return a verdict in the nonmoving

party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A fact is "material" if, under the governing

substantive law, a dispute about the fact might affect the

outcome of the suit.  Id.  In considering a motion for summary

---

[4] This letter was addressed to Judge Joel Schneider, the
United States Magistrate Judge assigned to this case.  Therefore,
the November 30th Order referenced by Plaintiff in his letter is
an order executed by Judge Schneider, which referred to an
earlier order of this Court executed by Judge Hillman, the United
States District Court Judge presiding over this case.

judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." <u>Marino v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**III.   DISCUSSION**

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other

7

proper proceeding for redress[.]

42 U.S.C. § 1983.  The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws."  Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004) (internal citation omitted); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).  Federal law requires a plaintiff to satisfy two steps in order to properly establish a § 1983 claim: (1) the deprivation of a constitutional right or other federal law, and (2) that a "person acting under the color of state law" is responsible for the alleged deprivation.  Collins v. City of Harker Heights, 503 U.S. 115, 119-20 (1992).

In the instant case, in his Complaint, Plaintiff avers that the Defendant officers in this action violated his constitutional rights by falsely arresting him and searching his property without a warrant or probable cause.  (Compl. at 3-4.)  In the instant Motion before the Court, Defendants allege that they are entitled to summary judgment because Johnson cannot sustain a cause of action under § 1983 pursuant to the Heck Doctrine and because an arrest warrant was not necessary prior to taking Johnson into custody.  (Defs.' Mot. Summ. J. at 7, 15.) Defendants also move for summary judgment on the basis that they are entitled to qualified immunity.  (Id. at 12-15.)

8

The qualified immunity doctrine serves as an affirmative defense, and the Third Circuit has therefore cautioned the district courts to "resolve any immunity question at the earliest possible stage of any litigation[.]" See Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995); Crawford-El v. Britton, 523 U.S. 574, 587 (1998) ("[Q]ualified immunity is an affirmative defense[.]"); Farmer v. Hayman, No. Civ.A.06-3084, 2008 WL 141104, at *5 n.3 (D.N.J. Jan. 11, 2008) (Simandle, J.) ("In light of the importance of resolving immunity questions at the earliest possible stage in litigation, the Court addresses the immunity analysis at the outset."). The Court will therefore begin its analysis with an assessment of Defendants' qualified immunity defense.

**A.    The Qualified Immunity Doctrine**

An officer is entitled to qualified immunity if he reasonably could have believed that his conduct was lawful in light of clearly established law and the information that was in his possession at the time. Palma v. Atl. Cnty., 53 F.Supp.2d 743, 768 (D.N.J. 1999)(internal citations omitted). "In cases involving claims for unlawful arrest . . . , the qualified immunity analysis turns on whether the police officers reasonably but mistakenly concluded that probable cause existed to arrest, detain and initiate the criminal prosecution." Id. In determining whether the doctrine is applicable, however, the

plaintiff's subjective beliefs are irrelevant. See Anderson v. Creighton, 483 U.S. 635, 636 (1987); Green v. City of Patterson, 971 F. Supp. 891, 901 (D.N.J. 1997). Furthermore, the doctrine provides room for reasonable mistakes in an officer's judgment, and serves to protect "all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Orsatti, 71 F.3d at 484) (further citations omitted); see also Palma, 53 F.Supp.2d at 768.

In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court established the standard for invoking qualified immunity: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818 (internal citations omitted). Subsequently, in Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court refined this standard by formulating a two-pronged inquiry into the actions of the officer: (1) whether, taken in the light most favorable to the plaintiff, the alleged facts indicate the deprivation of an actual constitutional right; and (2) if so, whether the right was clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful. Id. at 201, overruled in part on other grounds; see also Street v. Atl. Cnty. Justice Facility, No. Civ.A.09-6062,

2012 WL 273787, at *3 (D.N.J. Jan. 31, 2012) (Rodriguez, J.);

McErlean v. Merline, No. Civ.A.07-5681, 2011 WL 540871, at *9

(D.N.J. Feb. 8, 2011) (Bumb, J.); Pagan v. Ogden, No.

Civ.A.09-00002, 2010 WL 3058132, at *6 (E.D. Pa. July 30, 2010).

In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court

held that the sequence of the Saucier inquiry was not mandatory,

and found that district courts should exercise their "sound

discretion" in determining which prong to address first.  Id. at

236; see also Street, 2012 WL 273787 at *3.

Saucier's first prong instructs the Court to consider

whether the facts alleged by the plaintiff indicate that the

officers' conduct in the instant case violated a constitutional

right.  Saucier, 533 U.S. at 201. In his Complaint, Johnson

alleges that "[o]n October 8, 2008, these officers pulled me over

in my car without a warrant, searched my person and my car and

home and arrested me without cause!"[5]  (Compl. at 4.) In essence,

Johnson alleges that the defendant officers violated his Fourth

Amendment rights to be free from unreasonable search and seizure

by falsely arresting him and unlawfully searching his home and

vehicle.[6]  More specifically, Johnson contends that the officers'

---

[5] At other points in the Complaint, Johnson acknowledges
that the officers had a warrant in their possession, but argues
that it was not valid because it was not signed by a judge.  (See
Compl., Ex. 1.)

[6] Although Johnson makes no mention in his Complaint of the
Fourth Amendment or the precise constitutional rights he believes

search and seizure was unlawful because they lacked probable

cause and a warrant.[7]  In response, Defendants assert that they

---

were violated, the Court liberally construes Plaintiff's
allegations in his favor because it is cognizant of the fact that
he is a pro se litigant perhaps unfamiliar with the law and civil
litigation practice in this Court.  See Haines v. Kerner, 404
U.S. 519, 520 (1972) (recognizing that the allegations of a pro
se complaint are held to less stringent standards than formal
pleadings drafted by lawyers); Pressley v. E. Dist. Precinct, No.
Civ.A.09-3215, 2012 WL 70833, at *2 (Jan. 9, 2012)(same); Boss v.
Christie, No. Civ.A.10-2396, 2010 WL 5068061, at *2 (D.N.J. Dec.
3, 2012)(same).

     [7]  Plaintiff has not specified whether he is suing the
officers in their "individual or "official" capacities.  Suits
against officers acting in their individual capacity "seek to
impose individual liability upon a government officer for actions
taken under color of state law."  Hafer v. Melo, 502 U.S. 21, 25
(1991).  On the other hand, suits against officers acting in
their official capacity should be treated as suits against the
government entity itself "[b]ecause the real party in interest .
. . is the governmental entity and not the named official, [and
thus] 'the entity's policy or custom must have played a part in
the violation of federal law.'"  Id. (quoting Monell v. Dep't Soc.
Servs., 436 U.S. 658, 694 (1978)) (further citation omitted).
     As mentioned above, Atlantic City has already been dismissed
as a Defendant in this case.  As such, the Court need not opine
any further on whether Johnson's claims against the officers were
based on actions taken in their official capacities.  See
Anderson v. City of Phila., No. Civ.A.11-6318, 2012 WL 3235163,
at *10 (E.D. Pa. Aug. 8, 2012) (declining to consider plaintiff's
claims against defendant police officers in their official
capacities because the parties previously entered into a
stipulation dismissing the City of Philadelphia as a defendant).
     In any event, even if Johnson did intend to sue the officers
in their official capacity, this still would not change the
outcome here.  It is well established that only officers sued in
their individual capacities are entitled to assert qualified
immunity as a defense.  See Owen v. City of Indep., 445 U.S. 622,
650-53 (1980); Keahey v. Bethel Twp., No. Civ.A.11-7210, 2012 WL
478936, at *8 n.11 (E.D. Pa. Feb. 15, 2012).  Municipalities,
however, are not entitled to qualified immunity protection.
Owen, 445 U.S. at 650.  Since an officer's actions in an official
capacity suit are essentially a suit against the affiliated
government entity itself, the only immunities available to

are entitled to qualified immunity for Plaintiff's claims because
no constitutional violation occurred since they had probable
cause to arrest him and obtained valid warrants prior to
searching his car and apartment.  (Defs.' Mot. Summ. J. at
12-15.)

Broadly stated, the Fourth Amendment prohibits the
unreasonable search and seizure of both a person and his property
absent a judicially-sanctioned warrant supported by probable
cause.[8]  See Orsatti, 71 F.3d at 482. In the instant case,
Plaintiff's allegations appear to be two-fold: (1) that the
defendant officers violated his constitutional rights to be free
from an unreasonable search of his property when they searched
his vehicle and apartment without a warrant or probable cause;

---

defendants in official-capacity actions are those that the
governmental entity itself possesses.  Kentucky v. Graham, 473
U.S. 159, 167 (1985).  Thus, to the extent that Johnson meant to
sue the officers in their official capacity, their actions would
be imputed to the City, which has already been dismissed as a
Defendant in this case.

[8]  The Fourth Amendment provides that:

The right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable
searches and seizures, shall not be violated, and no
Warrants shall issue, but upon probable cause, supported
by Oath or affirmation, and particularly describing the
place to be searched, and the persons or things to be
seized.

U.S. CONST. AMEND. IV.  The Fourth Amendment is made applicable to
the states through the Fourteenth Amendment.  See Albright v.
Oliver, 510 U.S. 266, 272-73 (1994) (citing Mapp v. Ohio, 367
U.S. 643 (1961)) (further citation omitted).

and (2) that the officers violated his constitutional right to be free from an unreasonable seizure of his person when they falsely arrested him.

The Court first considers Plaintiff's claims that the officers' search of his car violated his Fourth Amendment rights. Generally speaking, a valid warrant issued by a judicial officer that is supported by probable cause indicates that the government has taken steps to protect — rather than violate — an individual's constitutional rights.  See Katz v. United States, 389 U.S. 347, 357 (1967).  Here, the evidence of record indicates that the search of Johnson's vehicle took place after he was arrested and placed in custody, and after a warrant was obtained to search the vehicle.[9]  For example, in his Report, Sergeant

_____

[9] Affording the Complaint a liberal reading, certain portions of it could be interpreted to say that the police searched Johnson's vehicle at the scene immediately after his arrest.  (See Compl. at 5 ("[T]hey ordered me out of the car without giving any reason for the stop, they then searched my person and my car, during the search of my car they found a plastic bag with some cocaine in it[.]").)  These allegations were made in Plaintiff's Complaint at the preliminary stages of proceedings.  Johnson has introduced no evidence to support these claims at the present summary judgment stage.  The applicable standard of review in the Court's initial review of a complaint is very different than the review afforded to such allegations at summary judgment.  At the pleading stage, the Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  See Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  At summary judgment stage, however, a party opposing summary judgment must do more than just rest upon mere allegations, denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  Given that Defendants have introduced evidence to support their statements that the vehicular search occurred at the

Sarkos stated as follows:

> [Johnson] was taken into custody, handcuffed, and searched incident to arrest by Detective Rose. . . . The BMW Mr. Johnson was driving was driven to the ACPD Forensic Bay where it was secured by Detective Daryl Dabney. . . . [In the interim,] a search warrant was being prepared by Detective James Scoppa of the Atlantic County Prosecutors Office for . . . the BMW Mr. Johnson had been driving. . . . [S]everal Detectives including myself responded to the ACPD police forensic bay where the BMW had been secured.  The search warrant for this vehicle was executed resulting in the recovery of a semi-automatic Taurus handgun.

(ACPD Rep. at 20-21.)  Plaintiff has introduced no evidence that this obtained warrant was in any way deficient.[10]  As such, the Court finds that Defendants did not violate Plaintiff's Fourth Amendment rights when they searched his vehicle.

The Court next considers whether Defendants' search of Johnson's alleged home was unlawful.  Similar to the search of Plaintiff's vehicle, the defendant officers obtained a warrant prior to executing their search.  In fact, the record indicates that, even though they arrived at the apartment complex several hours earlier, the officers did not enter the apartment itself

---

station pursuant to a valid warrant after Johnson was already in custody, and that Plaintiff has introduced no evidence of his own to contradict this point, the Court declines to credit Plaintiff's mere allegations.

[10]  Although Plaintiff alleges in his Complaint that the warrant was not signed by a judge until after it was executed, he once again has introduced no evidence into the record to support such an allegation.  Indeed, given that Plaintiff was in custody at the time of the acquisition of the warrant, it is difficult to see how he could have any basis to support his allegations.

until a search warrant was obtained to do so.  (See ACPD Rep. at
20-21.)  Once again, Plaintiff has introduced no evidence
indicating that a warrant was lacking or that the warrant issued
was in some way invalid.[11]  Thus, the Court likewise finds that
Defendants did not violate Plaintiff's constitutional rights when
they searched the apartment.[12]

---

[11]  Once again, the Court notes that, at points in his
Complaint, Johnson alleges that the defendant officers searched
the apartment prior to obtaining a judge's signature on the
warrant.  As noted above, a party must do more than just rest
upon mere allegations at the summary judgment stage.  Plaintiff
has introduced no evidence into the record to support his
allegation that a judge had not signed the search warrant prior
to its execution.

[12]  Although not an issue raised by either party, the Court
pauses to note that the apartment in question actually did not
belong to Johnson, but rather belonged to a third party — his ex-
girlfriend, Tashima Ragsdale.  (See ACPD Rep. at 21.)  In fact,
it is unclear from the record how much time Johnson actually
spent at the apartment such that he could be considered to live
there.  On the day of the execution of the warrant, Ragsdale only
indicated that Johnson had spent the night before the arrest in
her apartment.  (Id. at 21.)  At other points in the record,
however, it is stated that the officers routinely saw Johnson
entering this residence.  (Id. at 14 ("I, Dsgt. Ruark located the
BMW vehicle driven by Lamar Johnson during the course of this
investigation in the parking lot of Spartan Harbor Apartment
Complex in Brigantine NJ.  During the course of the investigation
Johnson frequented this complex — Apartment P1.").)
     As an initial matter, the Court questions whether Johnson
even has standing to object to the search of Ragsdale's
apartment. It has previously been recognized that a non-resident
arrestee has no standing to assert the rights of a third-party
resident whose residence is searched.  See United States v.
Stewart, 131 F. App'x 350, 352 (3d Cir. 2005) (discussing
Steagald v. United States, 451 U.S. 204, 212 (1981)).  Here,
although Johnson identifies Ragsdale's residence in his Complaint
as "my house" (see Compl. at 8), the evidence of record is
dubious as to whether he actually lived there.
     In any event, even if Johnson did have standing to object to

Having found that the search of Plaintiff's property was lawful, the Court now considers whether the search and seizure of Johnson's person was likewise constitutional.  Johnson contends that the officers pulled him over, arrested him, and searched him without cause.  (Compl. at 4.) Given that Johnson was placed under arrest, *i.e.* seized, before he was searched, the Court begins its analysis with Johnson's seizure.[13]

---

the search, there is no indication from the record that the search of the apartment was unlawful.  Rather, the police had a warrant to search the apartment.  While it has been recognized that law enforcement officers with an arrest warrant may not enter a third party's home to search it, see Steagald, 451 U.S. at 213-14; Bratton v. Toboz, 764 F. Supp. 965, 971 (M.D. Pa. 1991), the police here had a search — not arrest — warrant permitting them to lawfully search the residence defined in the warrant.  As such, the Court notes that, regardless to whom the residence belonged, the search of the apartment pursuant to the search warrant was lawful.

[13]  Defendants have introduced evidence indicating that Johnson was placed in handcuffs prior to the search of his person.  (See ACPD Rep. at 14, 16.)  In his Complaint, Johnson is unclear as to when he was handcuffed.  At one point, he indicates that "these officers pulled me over in my car without a warrant, searched my person . . . and arrested me without cause!"  (Compl. at 4.)  If read literally, this indicates that Johnson was handcuffed after he was searched.

The exact point at which Johnson was handcuffed, however, is irrelevant.  As indicated above, the law is clear that an individual is "seized" at the point in which a reasonable person would not feel free to ignore the police and go about his business.  See Kaupp v. Texas, 538 U.S. 626, 629 (2003).  The Supreme Court has articulated numerous examples of circumstances that constitute a "seizure" within the context of the Fourth Amendment, including:  "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  Applied to the instant

17

"A seizure of the person within the meaning of the Fourth []
Amendment[] occurs when, 'taking into account all of the
circumstances surrounding the encounter, the police conduct would
have communicated to a reasonable person that he was not at
liberty to ignore the police presence and go about his
business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting
Florida v. Bostick, 501 U.S. 429, 437 (1991); Michigan v.
Chesternut, 486 U.S. 567, 569 (1988)).  It is clear that the
formal arrest of an individual constitutes a seizure for purposes
of the Fourth Amendment.  Anderson, 2012 WL 3235163 at *6 (citing
Torres v. McLaughlin, 163 F.3d 169, 174 (3d Cir. 1998); Terry v.
Ohio, 392 U.S. 1, 19 (1968)("It is beyond dispute that the Fourth
Amendment has been construed to include events both before and
after a formal arrest.")).  All seizures of a person, such as a
formal arrest, must be supported by probable cause.  See Michigan
v. Summers, 452 U.S. 692, 696 (1981) (citing Dunaway v. New York,
442 U.S. 200, 207 (1979)).  If probable cause was absent to form
the basis of an arrest, an individual can bring a § 1983 claim
for false arrest.  See Criss v. Crossgrove, No. Civ.A.04-2244,

---

case, Johnson was seized for purposes of the Fourth Amendment
even before he was actually handcuffed.  Rather, he was most
likely deemed "seized" when he was pulled over and ordered out of
his vehicle because a reasonable person would not have felt free
to ignore the police and continue about his business at this
point.  As such, Johnson was "seized" for purposes of the Fourth
Amendment, regardless of when he was handcuffed, prior to the
search of his person.

2007 WL 542228, at *7 (D.N.J. Feb. 16, 2007) (citing <u>Ramirez v. United States</u>, 998 F. Supp. 425, 430 (D.N.J. 1998)).  "Therefore, a defense to a false arrest claim is the establishment of probable cause."  <u>Criss</u>, 2007 WL 542228, at *7 (citing <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988)).  Probable cause is present when, considering the totality of the circumstances, "the facts and circumstances within the officer's knowledge were sufficient to warrant a prudent man in believing a crime had been committed."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991); <u>see also</u> <u>Sharrar v. Felsing</u>, 128 F.3d 810, 818 (3d Cir. 1997).

In this case, the record is unclear as to whether the defendant officers actually had an arrest warrant for Johnson at the time that he was formally arrested.  In the submitted police reports detailing the arrest, the officers merely state that, while Sergeant Sarkos and Detective Rose were visually surveying Johnson, Sergeant Ruark was "preparing" an arrest warrant to be sworn out before the magistrate.  (<u>See</u> ACPD Rep. at 14, 16, 20.)  More specifically, Sergeant Ruark stated as follows:

> [Johnson's] vehicle was placed under surveillance by Dsgt. James Sarkos and Det. Timothy Rose, while I went to prepare the warrant (0102 W 2008 008233) then swear out the warrant with Judge Garofolo.  While this was occurring Sarkos observed Johnson enter the BMW vehicle and leave the complex.  Sarkos conferred with me if I wanted Johnson stopped and arrested.  I advised him the warrant was prepared and to place Johnson under arrest.

(Id. at 14.)  Similarly, Sergeant Sarkos stated as follows in his report:

> Sgt. Ruark requested surveillance be set up on this vehicle as an arrest warrant was going to be executed for the male. . . . At approximately 1240 hours I observed an individual later identified as Lamar Johnson walking from the Spartan Harbor Apartments and entering the BMW. . . . Detective Rose and I followed the vehicle. . . . It was decided by Sgt. Ruark (via communication between him and I by telephone) and I that this vehicle would be stopped and Mr. Johnson was to be taken into custody.

(Id. at 20.)  Although Judge Garofolo eventually approved and authorized the arrest warrant, these reports do not indicate whether the warrant had actually been authorized at the time of Johnson's arrest.

The Fourth Amendment requires an arrest warrant issued by a judicial officer to be supported by probable cause.  See Johnson v. United States, 333 U.S. 10, 13-14 (1948); Illinois v. Gates, 462 U.S. 213, 238 (1983).  Thus, in order for the Superior Court Judge to have approved and issued the warrant for Johnson's arrest, he must have made a determination that it was supported by probable cause.  Therefore, if the officers did actually secure the warrant prior to arresting Johnson, then probable cause existed to effectuate the arrest.

However, even if the defendant officers did not actually have the arrest warrant prior to seizing Johnson, the arrest would nonetheless be lawful if it was supported by probable cause.  It is well established that an officer may conduct a

20

warrantless arrest if the arrest was based on probable cause. See United States v. Pickford, 252 F. App'x 440, 443 (3d Cir. 2007) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004))("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."); see also United States v. Brown, 33 F. App'x 606, 608 (3d Cir. 2002); United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (citing United States v. Watson, 423 U.S. 411, 421 (1976) ("Law enforcement authorities do not need a warrant to arrest an individual in a public place so long as they have probable cause to believe that person has committed a felony.")).  "Probable cause to support an arrest exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested."  United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007) (citing Draper v. United States, 358 U.S. 307, 313 (1959); United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002)).

The Third Circuit has previously recognized that probable cause to arrest can arise from the observation of a suspect's ongoing participation in criminal activity by means of an active undercover investigation.  See United States v. Burton, 288 F.3d

21

91, 97 (3d Cir. 2002).  Here, Sergeant Ruark — the officer in charge of the drug investigation involving Johnson — developed probable cause to arrest Johnson from the information he gleaned over the course of the seven-month-long investigation. (ACPD Rep. at 14.)  In particular, Sergeant Ruark and the other investigating officers observed and collected information from several confidential informants that conducted controlled drug buys with Johnson.  (See ACPO Inv. Reps.)  Several of these "sting" drug deals with Johnson were monitored by the investigation team through a digital recorder.  (Id.)  During these monitored drug exchanges, the officers observed Johnson in the same vehicle in which he was subsequently arrested.  (Id.)  Also as a result of these controlled buys, the investigating officers collected crack cocaine that Johnson sold to the confidential informants.  (Id.)  Furthermore, Sergeant Ruark obtained a wiretap on Johnson's cell phone during the course of the investigation to monitor his involvement in the drug scheme. (ACPD Rep. at 14.)  A reasonable officer observing all this conduct could certainly conclude that Johnson had and was continuing to commit criminal offenses.  As such, even without an arrest warrant, Sergeant Ruark had probable cause to arrest Johnson on October 8, 2008.

Sergeant Ruark, however, was not the officer that actually placed Johnson under arrest.  Rather, Sergeant Sarkos and

22

Detective Rose were the officers on the scene that arrested
Johnson while Sergeant Ruark was busy swearing out the arrest
warrant before the magistrate.  The question before the Court
therefore is whether Sergeant Ruark's probable cause basis to
arrest Johnson could be imputed to Sergeant Sarkos and Detective
Rose.

"Under the collective knowledge doctrine, the knowledge of
one law enforcement officer may be imputed to the officer who
actually conducted the seizure, search, or arrest." United
States v. Dono, No. Civ.A.10-763, 2011 WL 941465, at *5 (E.D. Pa.
Mar. 17, 2011) (citing United States v. Whitfield, 634 F.3d 741
(3d Cir. 2010)) (internal quotation marks omitted); see also
United States v. Haines, No. Civ.A.11-706-01, 2012 WL 1856495, at
*1-2 (E.D. Pa. May 16, 2012).  The collective knowledge doctrine
exists because it "makes little sense from a practical
standpoint" to base the legitimacy of an arrest or stop solely on
what the officer who first approaches a suspect knows, "rather
than on the collective knowledge of all the officers who
participate directly" in the search or arrest.  United States v.
Cook, 277 F.3d 82, 86 (1st Cir. 2002).  Indeed, the Third Circuit
has recently acknowledged that "[i]t would make little sense to
decline to apply the collective knowledge doctrine in a fast-
paced, dynamic situation . . . in which the officers worked
together as a unified and tight-knit team, [because] it would be

23

impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent[.]"  Whitfield, 634 F.3d at 746.[14]

The Court of Appeals has cautioned, however, that "[p]robable cause exists only if the statements made by fellow officers are supported by actual facts that can satisfy the probable cause standard," and that "statements by fellow officers conveying that there is probable cause for a person's arrest, by themselves, cannot provide the facts and circumstances necessary to support a finding of probable cause."  Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997) (citing United States v. Hensley, 469 U.S. 221, 231 (1985)); see also United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause" for an arrest).  Thus, the Third Circuit has made clear that:

> The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect.  Moreover, an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.

---

[14] In Whitfield, the Third Circuit affirmed the decision of the district court and extended the reach of the collective knowledge doctrine to apply to a Terry stop requiring reasonable suspicion.  Id. at 745 (affirming D.C. Crim. No.08-cr-00685-001 (D.N.J.)(Hillman, J.)).

24

Rogers, 120 F.3d at 453 (citing Hensley, 469 U.S. at 231;

Whiteley v. Warden, 401 U.S. 560, 568 (1971)).[15]

The United States Court of Appeals for the Tenth Circuit

recently applied the collective knowledge doctrine in a largely

similar factual scenario in United States v. Chavez, 534 F.3d

1338 (10th Cir. 2008).[16]  In Chavez, the Drug Enforcement Agency

("DEA") conducted a several months-long investigation into drug

operations in New Mexico.  Id. at 1340.  During the course of the

_____

[15]  In their summary judgment motion, Defendants cite
Whiteley as the Supreme Court case which developed the collective
knowledge doctrine.  (Defs.' Mot. Summ. J. at 13.)  Whiteley,
however, did not establish this doctrine.  In fact, the words
"collective knowledge doctrine" are noticeably absent from the
Supreme Court's decision.  Rather, in Whiteley, the Court merely
suggested in dicta that an arresting officer could rely on an
arrest warrant obtained by another law enforcement agency.  Id.
at 568.

[16]  In addition to the Third and Tenth Circuits, the Second,
Fifth, Seventh, and Ninth Circuits have likewise upheld — or at
least favorably discussed — the use of the collective knowledge
doctrine in establishing probable cause to arrest a suspect under
similar circumstances.  See United States v. Colon, 250 F.3d 130,
135-36 (2d Cir. 2001) ("A primary focus in the [collective]
knowledge cases is whether the law enforcement officers
initiating the [] arrest, on whose instructions or information
the actual [] arresting officers relied, had information that
would provide [] probable cause to [] arrest the suspect.");
United States v. Ibarra-Sanchez, 199 F.3d 753, 758-59 (5th Cir.
1999); United States v. Celio, 945 F.2d 180, 183 (7th Cir. 1991);
United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007)
("Under the collective knowledge doctrine, we must first
determine whether an . . . arrest complied with the Fourth
Amendment by looking to the collective knowledge of all the
officers involved in the criminal investigation although all of
the information known to the law enforcement officers involved in
the investigation is not communicated to the officer who actually
undertakes the challenged action.") (internal citation and
alteration of text omitted).

investigation, the DEA utilized confidential informants, wiretaps on suspects' cell phones, and controlled drug buys.  Id. at 1341. Based on information supplied to them by a confidential informant, the DEA requested a New Mexico State police officer to assist them in their investigation by monitoring and performing a pre-planned traffic stop of the suspects on their way back from a planned drug deal.  Id.  Prior to the stop, the DEA agents provided the officer with the license plate number and vehicle description, the number of suspected occupants, and informed him that the vehicle was transporting drugs.  Id. at 1342.  On appeal, the Tenth Circuit held that the DEA agents possessed the requisite probable cause to arrest the defendant based on the knowledge they had gleaned from their investigation.  Id. at 1344.  The Tenth Circuit further found that this determination of probable cause could be imputed to the patrol officer, regardless of whether he was aware of all the facts of the underlying investigation, because "the aspects of the DEA investigation that [were] pertinent to the probable cause inquiry" were known to the agent that instructed him to stop the vehicle, and he "acted on the strength of the DEA's probable cause when he stopped and searched [the] truck."  Id. at 1347.

Similar to Chavez, in the instant case, Sergeant Ruark requested Sergeant Sarkos and Detective Rose to assist him in the surveillance of Johnson because he was going to swear out his

arrest warrant before a magistrate.  (See ACPD Rep. 14, 16, 20.)
According to the officers' reports, Ruark advised Sarkos and Rose
that Johnson was the wanted subject of an ongoing investigation
by his team, and instructed them to monitor Johnson while he
prepared the arrest warrant.  (Id. at 16, 20.)  Sergeant Ruark
also provided Sarkos and Rose with relevant background
information, including the make, model, color and license plate
number of Johnson's car, as well as the exact address of the
apartment unit that he frequented in Brigantine.  (Id. at 14, 16,
20.)  The record indicates that Sarkos and Rose were in
continuous contact with Ruark during the surveillance.  (Id. at
16, 20.)  When Johnson left the apartment complex in his vehicle
and began to travel to Atlantic City, Sergeant Sarkos called
Sergeant Ruark for further instruction.  (Id. at 14, 20.)  At
this point, Ruark instructed Sarkos and Rose to detain and arrest
Johnson, and the officers did so based on Ruark's instruction.
(Id. at 14, 16, 20.)  Thus, Sarkos and Rose acted on the strength
of Ruark's probable cause — and pursuant to his instruction —
when they detained and arrested Johnson.  While Sarkos and Rose
may not have been privy to all the facts of the investigation
which amounted to probable cause, "it is well established [] that
the arresting officer need not possess an encyclopedic knowledge
of the facts supporting probable cause, but can instead rely on
an instruction to arrest delivered by other officers possessing

27

probable cause." United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002).  As such, regardless of whether or not the defendant officers physically had an arrest warrant in their possession, they did not violate Johnson's Fourth Amendment rights because their collective knowledge of the situation provided the requisite probable cause to support his arrest.

Finally, the Court considers whether the defendant officers violated Johnson's Fourth Amendment rights when they searched his person, and, as a result, uncovered contraband.  According to the record, immediately after Johnson was handcuffed, Detective Rose observed him bend over to his left side.  (ACPD Rep. at 16.) Rose recognized this maneuver as an attempt to conceal a weapon or contraband, and therefore conducted a pat-down of Johnson's person.  (Id.)  During the search, Rose uncovered a bag filled with crack cocaine and a large wad of cash.  (Id.)  It has long been established that a search incident to an arrest is valid if the arrest itself was valid.  See United States v. Goode, 309 F. App'x 651, 654 (3d Cir. 2009) (citing Segura v. United States, 468 U.S. 796, 824 n.15 (1984), which noted that the validity of searches incident to arrest has been settled since Agnello v. United States, 269 U.S. 20 (1925)); see also United States v. Brown, 33 F. App'x 606, 608 (3d Cir. 2002) (internal citation omitted).  As discussed in extensive detail above, Johnson's arrest was supported by probable cause, and was therefore valid.

28

Accordingly, it follows that any search of Johnson's person conducted incident to his arrest was likewise lawful.  Thus, the defendant officers did not violate Johnson's constitutional rights when they searched his person.

Based on the above, the Court finds that the defendant officers did not violate Johnson's constitutional rights under these circumstances.  As such, Sergeant Ruark, Sergeant Sarkos, and Detective Rose are entitled to shield themselves from liability for their actions here pursuant to the doctrine of qualified immunity.[17]  Accordingly, summary judgment will be entered in Defendants' favor on the entirety of Plaintiff's claims against the remaining Defendants.[18]

An appropriate Order follows.

     /s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

---

[17] Given the Court's present finding that no constitutional violations occurred based on the allegations set forth by Johnson, the Court need not engage in an analysis of Saucier's second step, i.e. whether the alleged constitutional rights were clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.").

[18] Since Defendants are entitled to the affirmative defense of qualified immunity for their actions under these circumstances, the Court need not consider the other arguments asserted by Defendants in their summary judgment motion.

At Camden, New Jersey
Dated: December 27, 2012